**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Ameristone Tile, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:13-cv-00670-PMD |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Ceramic Consulting Corporation, Inc.; | ) | |
| Mario Klappholz; Scott Alpert; Floors | ) | |
| 2000, Inc.; and Jason Jones, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court upon two motions to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), for improper venue pursuant to Rule 12(b)(3), and for failure to state a claim pursuant to Rule 12(b)(6). The first motion was brought by Defendants Ceramic Consulting Corporation, Inc. ("Ceramic"), Mario Klappholz ("Klappholz"), and Scott Alpert ("Alpert"), (collectively, "Ceramic Defendants"), and the second motion was brought by Defendants Floors 2000, Inc. ("Floors 2000") and Jason Jones ("Jones"), (collectively, "Floors Defendants"). For the reasons that follow, the Court grants in part and denies in part the Ceramic Defendants' motion and grants the Floors Defendants' motion.

## BACKGROUND[1]

Ameristone is a South Carolina limited liability company headquartered in Mt. Pleasant, South Carolina. Ameristone is in the business of developing and selling porcelain and ceramic tile products. Ameristone develops tile products with its manufacturing partners, incurring

---

[1] The statement of facts is drawn from Ameristone's Complaint, as these facts must be treated as true for purposes of Rule 12(b)(6).

1

product development costs in doing so, and then sells those products to retailers. In May 2010, Ameristone entered into an Agent Contract Agreement ("Agent Agreement") with Ceramic, in which Ceramic agreed to act as Ameristone's exclusive sales agent for a very large territory, including fifteen states and twenty-five islands and nations in the Caribbean (the "Territory"). Notably, South Carolina is not part of the Territory. Under the Agent Agreement, Ameristone relied exclusively on Ceramic to sell its products within the defined Territory, and Ameristone was precluded from selling its own products by any other means in that Territory.

In September 2011, Ceramic's sales agent Scott Alpert informed Ameristone about a "large volume" sales opportunity at Lowe's Home Improvement Warehouse ("Lowe's"). This new opportunity was a "stocking program," under which Lowe's would select various tiles to be stocked in 250 Lowe's stores initially, with potential for expansion to 1,750 Lowe's stores nationwide. Alpert requested samples of Ameristone's products for submission to Lowe's for this program. In response, Ameristone's President, Mark Campbell, began the work necessary to develop tiles for the Lowe's submission. Ameristone incurred approximately $14,000 in hard costs, traveling to visit two of its manufacturers in Spain—Gayafores and Tau Ceramica—to develop and produce tile samples for the Lowe's submission. Once the samples were completed and approved by Ameristone, the manufacturer stamped its insignia on the back of the tile, signifying its origin in accordance with industry practice.

Defendant Floors 2000, a tile distributor, was working with Ceramic and Ameristone at the time of the Lowe's submission, and it was Floors 2000's employee, Defendant Jason Jones, who received Ameristone's tile samples and presented them to Lowe's for the stocking program. In all, Ameristone provided eighteen (18) tile samples to Floors 2000 for the Lowe's submission. In early January 2012, Ameristone's exclusive agent, Defendant Alpert, informed Ameristone

2

that eight (8) of the Ameristone samples had made the second cut in the Lowe's selection process, including Ameristone's *Daino* sample from the Gayafores plant in Spain and Ameristone's *Breccia* sample from the Tau Ceramica plant in Spain.  In late February 2012, however, Alpert called Ameristone's Mark Campbell at his office located in South Carolina and told him that none of the Ameristone tiles had been selected for the Lowe's submission.

To the contrary, however, two of Ameristone's tile samples were selected by Lowe's—the *Breccia* and *Daino*—but, unbeknownst to Ameristone and without Ameristone's permission or consent, Ameristone's exclusive agents Defendants Alpert and Klappholz contacted the Atlanta, Georgia office of Ege Ceramics ("Ege") and arranged to have Ege replicate and produce the two Ameristone tile samples to fill the Lowe's order.  Defendants Alpert and Jones traveled to the Ege factory in Turkey to approve the samples for production.  By April 2012, Ege had shipped approximately two million square feet of the copied Ameristone product for placement in Lowe's, equaling $1,900,000 of the $2,489,000 opening order.  In June 2012, Defendant Alpert again told Ameristone's Mark Campbell via a telephone call to him in South Carolina that it was too bad that Lowe's did not select any Ameristone products, and he mentioned that Lowe's had selected two other products Floors 2000 had submitted, which products were being manufactured in Turkey.

Ameristone's Mark Campbell reviewed a document, given to Ege by Ceramic, that listed the stores to which Lowe's planned to distribute the copied tiles.   This list included several South Carolina stores, including store #1004 in Myrtle Beach.  In August 2012, Ameristone's Mark Campbell purchased the copied *Daino* and *Breccia* tiles—renamed *Galini* and *Lisano*—from Lowe's store # 1004 in Myrtle Beach, South Carolina.

3

## ANALYSIS

I.      **Motions to Dismiss for Lack of Personal Jurisdiction under Rule 12(b)(2)**

Defendants Klappholz, Alpert, Jones, and Floors 2000 have moved to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2).   Defendant Ceramic has not made such a motion.[2]

### A.  Legal Standard under Rule 12(b)(2)

When personal jurisdiction is challenged by the defendant, the plaintiff has the burden of showing that jurisdiction exists.  *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997). When the court addresses the issue of jurisdiction on the basis of motion papers and supporting legal memoranda without an evidentiary hearing, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge."  *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).   "[T]he court must take all disputed facts and reasonable inferences in favor of the plaintiff."   *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).   In deciding the jurisdictional issue, the court may consider pleadings, affidavits, and other evidentiary materials.   *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992).

"[T]o validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied."  *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).  First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and second, the exercise of personal jurisdiction must not "overstep the

---

[2] In the Agent Agreement entered into by Ceramic and Ameristone, there is a forum selection clause that states: "This contract shall be governed, construed and interpreted in accordance with the law of the State where [Ameristone] holds its headquarters, in Mt. Pleasant, South Carolina, U.S.A.  The parties consent to the exclusive jurisdiction of the courts of the considered State and/or the United States District Court for the District of the State where [Ameristone] holds its headquarters for any disputes arising hereunder."  Agent Agreement ¶ 6.2, dkt. 5-1.

bounds" of Fourteenth Amendment due process. *Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 317 (4th Cir. 2000). South Carolina's long-arm statute has been construed to extend to the outer limits allowed by the Due Process Clause. *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir. 2002). Thus, the scope of the court's inquiry is whether defendants have "certain minimum contacts" with the forum, such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted).

A defendant has minimum contacts with a jurisdiction if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Under this standard, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In determining the existence of minimum contacts, the court is mindful that it must draw all reasonable inferences from both parties' pleadings, even if they conflict, in the Plaintiff's favor. *See, e.g., Precept Med. Prods., Inc., v. Klus*, 282 F. Supp. 2d 381, 385 (W.D.N.C. 2003) (explaining that "for the purposes of a Rule 12(b)(2) motion, the Court will accept the Plaintiff's version of disputed facts").

The analytical framework for determining whether minimum contacts exist differs according to which species of personal jurisdiction—general or specific—is alleged. *See generally ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623-24 (4th Cir. 1997). When a cause of action arises out of a defendant's contacts with the forum, a court may seek to exercise specific jurisdiction over a defendant that purposefully directs activities toward the forum state

5

and the litigation results from alleged injuries that arise out of or relate to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985). However, when the cause of action does not arise out of the defendant's contacts with the forum, general jurisdiction may be exercised upon a showing that the defendant's contacts are of a "continuous and systematic" nature. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

### B.  Application of the legal standard to the Defendants

Plaintiff all but concedes that Defendants Klappholz, Alpert, Jones, and Floors 2000 are not subject to general jurisdiction in South Carolina. Indeed, upon review of the record, the Court concludes that these Defendants were not engaged in "substantial" or "continuous and systematic" activities in South Carolina such as to subject them to general jurisdiction in the State. Thus, the Court will have jurisdiction over these Defendants only if Defendants' contacts were sufficient to subject them to specific jurisdiction in South Carolina.

The Fourth Circuit has applied a three-part test when evaluating the propriety of exercising specific jurisdiction: (1) whether and to what extent the defendant purposely availed itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claims arise out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." *Nolan*, 259 F.3d at 215-16 (citing *Helicopteros*, 466 U.S. at 414-16, and *Burger King*, 471 U.S. at 472, 476-77).

The Supreme Court has made clear that an out-of-state party's contract with a party based in the forum state cannot "automatically establish sufficient minimum contacts" in the forum state. *Burger King*, 471 U.S. at 478. Instead, the court must perform an individualized and pragmatic inquiry into the surrounding facts of the disputed contractual relationship to determine

6

"whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479. Although the test for purposeful availment can be somewhat imprecise, significant factors typically include: (a) whether the defendant maintains offices or agents in the forum state; (b) whether the defendant owns property in the forum state; (c) whether the defendant reached into the forum state to solicit or initiate business; (d) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (e) whether the parties contractually agreed that the law of the forum state would govern disputes; (f) whether the defendant made in-person contact with the resident of the forum state in the forum state regarding the business relationship; (g) the nature, quality, and extent of the parties' communications about the business being transacted; and (h) whether the performance of contractual duties was to occur within the forum. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). Underlying these factors is the central question of whether each defendant has performed purposeful acts in the forum state such that the defendant has created a substantial relationship with the forum state. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451 (4th Cir. 2000).

### 1. Ceramic Defendants

In an affidavit, Mark Campbell, President of Ameristone, sets forth the following facts to establish that Defendants Klappholz and Alpert purposely availed themselves of the privileges of conducting activities in South Carolina. Ameristone's first contact with Ceramic was a telephone call from Alpert to Campbell in Campbell's South Carolina office, in which Alpert informed Campbell that Ceramic was interested in representing Ameristone products. After several meetings with Klappholz and Alpert at a national ceramic trade show, followed by two weeks of negotiations by telephone and email from his South Carolina office, Campbell executed

the Agent Agreement.  Klappholz signed the Agent Agreement as President of Ceramic on May 21, 2010, mailed it to Campbell in South Carolina, and Campbell signed it in South Carolina as President of Ameristone on May 28, 2010.  Shortly thereafter, Klappholz arranged an in-person meeting with Campbell in Mount Pleasant, South Carolina, in which Campbell made an in-depth presentation of the Ameristone product line.  Additionally, after entering into the Agent Agreement, Campbell spoke to Klappholz one to two times per week and spoke or emailed with Alpert numerous times each day from his office in South Carolina.  Moreover, the majority of Ameristone's obligations under the Agent Agreement were carried out by Campbell from his office in South Carolina.

Campbell further avers that in September 2011, Alpert contacted him at his South Carolina office to inform him of the Lowe's stocking program and to request samples of Ameristone's products for submission to Lowe's.  Campbell agreed to provide products, traveled to Spain to meet with the manufacturers, but conducted the vast majority of the work from his office in South Carolina.  Over the next month, Campbell was in daily communication from South Carolina with Alpert regarding preparations for the Lowe's submission, and Klappholz was copied on most of the communications and participated in some of the conversations.  Both Alpert and Klappholz knew that the *Breccia* and *Daino* tiles were part of the Lowe's submission. Alpert informed Campbell by telephone at his office in South Carolina that the Lowe's presentation had gone well, and a few weeks later Alpert informed Campbell in South Carolina that eight of the Ameristone samples had been selected as part of a "second cut," including the *Breccia* and *Daino*.  In late February 2012, after several inquiries by Campbell, Alpert told Campbell by telephone at his South Carolina office that none of the Ameristone tiles had been selected for the Lowe's program.

8

In May 2012, Campbell learned that Klappholz and Alpert had contacted the Atlanta, Georgia office of Ege Ceramics, a Turkish tile manufacturer, in March 2012 to inquire about production of two tiles for a large volume order. The Ameristone *Breccia* and *Daino* tile samples were sent to Ege by Jason Jones and either Alpert or Klappholz. Alpert and Jones later traveled to a factory in Turkey to approve production of the recreated Ameristone samples. In June 2012, Campbell asked Alpert again about the Lowe's submission, and Alpert told him via a telephone call to Campbell's South Carolina office that it was too bad Lowe's did not select any Ameristone products and that Lowe's had chosen two products submitted by Floors 2000 that were being manufactured in Turkey. Klappholz and Alpert were aware that the Turkish tiles would be sold in Lowe's stores in South Carolina. In fact, Campbell purchased the copied tiles at a Lowe's store in Myrtle Beach, South Carolina, in August 2012. The same tiles are also sold at the Lowe's store in Mount Pleasant, South Carolina.

Based on the Complaint and Campbell's affidavit, Defendant Alpert had the following contacts with South Carolina: (1) he reached into South Carolina and initiated the business relationship by calling Campbell at his South Carolina office and proposing that Ceramic represent Ameristone as an exclusive agent; (2) he maintained almost daily email and telephone contact with Campbell regarding Ameristone's business, particularly during the month-long preparation for the Lowe's presentation; (3) in September 2011, he contacted Campbell in South Carolina to tell him about the Lowe's stocking program and to request Ameristone samples for submission; (4) he informed Campbell in South Carolina that the Lowe's presentation had gone well and that eight of Ameristone's samples had made the "second cut"; (5) in February 2012, he told Campbell in South Carolina by telephone that none of the Ameristone samples had been selected; and (6) in June 2012, he told Campbell in South Carolina by telephone that it was too

9

bad that none of the Ameristone tiles had been selected but that two Turkish-made tiles presented by Floors 2000 had been selected. According to Alpert's Declaration, Alpert also had one in-person meeting with Campbell in South Carolina around May 2012 in which Alpert and Campbell discussed Ceramic's business relationship with Ameristone in general, but did not discuss the Lowe's program. Finally, most of Ameristone's obligations under the Agent Agreement and in preparation for the Lowe's presentation were carried out in South Carolina. Thus, Alpert reached into South Carolina to initiate the business relationship in general and specifically to solicit Ameristone's participation in the Lowe's program; he made in person contact with Campbell at least once to discuss the business relationship; he maintained almost daily communication with Campbell, who was located in South Carolina, regarding the relationship and the Lowe's program;[3] and he knew Ameristone was to perform its contractual duties mainly in South Carolina. Under these facts, the Court concludes that Alpert "purposefully established minimum contacts within the forum." *Burger King*, 471 U.S. at 479; *see CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 294-97 (4th Cir. 2009) (finding personal jurisdiction where foreign defendant (1) reached into the forum state to initiate business with plaintiff, (2) corresponded and collaborated with plaintiff over an extended period, and (3) made in-person contact with plaintiff twice).

The Court also concludes that Defendant Klappholz purposely established minimum contacts within South Carolina. According to the Complaint and Campbell's affidavit,

---

[3] Defendants Alpert and Klappholz argue that their frequent communications with Campbell cannot be a basis for personal jurisdiction because they communicated with him via his cell phone and email without knowing where he was located at the time of those communications. In his supplemental affidavit, Campbell avers that during the period of preparation for the Lowe's presentation, he had almost daily telephone conversations in his office, mostly from or to his land line in South Carolina, with both Alpert and Klappholz, both of whom called him on his cell phone and land line frequently. Drawing all reasonable inferences in favor of Plaintiff and resolving factual disputes in Plaintiff's favor, as the Court must at this stage of litigation, the Court finds that these daily communications are a relevant factor to consider in the personal jurisdiction analysis.

Klappholz had the following contacts with South Carolina: (1) Klappholz mailed a signed Agent Agreement to Campbell in South Carolina; (2) Klappholz arranged and attended an in-person meeting with Campbell in South Carolina to see a presentation of the Ameristone product line; (3) Klappholz spoke to Campbell, who was in South Carolina, one to two times per week after entering into the Agent Agreement; (4) Klappholz was copied on most communications and participated in some conversations regarding the Lowe's program; and (5) Klappholz knew that Ameristone was to perform its contractual duties mainly in South Carolina.    Although Klappholz's contacts with South Carolina are not as extensive as Alpert's, the Court finds that he did have sufficient minimum contacts relating to the business relationship with Ceramic to satisfy prong one of the test.

Defendants Alpert and Klappholz argue that specific personal jurisdiction is lacking under the second prong of the test because Ameristone's claims do not arise out of their contacts with South Carolina.    The Court disagrees.    Ameristone's claims against these individual Defendants arise from their role as agents for Ameristone in general and specifically related to the Lowe's submission and presentation of Ameristone's tiles.    Despite the fact that Alpert knew that the *Breccia* and *Daino* tiles were Ameristone products, Alpert communicated directly to Campbell in South Carolina that none of Ameristone's tiles had been selected by Lowe's. Ameristone contends that this communication was the negligent misrepresentation alleged in Ameristone's Complaint.    Campbell later saw the Ameristone *Breccia* and *Daino* tiles at the offices of Ege Ceramics in Atlanta, Georgia, and was told by Ege's representative that both Klappholz and Alpert contacted him regarding replicating these tiles for the Lowe's stocking program.    Campbell avers that these tiles indeed were copied, reproduced, sold, and distributed to Lowe's.    According to Ameristone, these actions, in which Alpert and Klappholz were directly

11

and personally involved, injured Ameristone in South Carolina and form the basis for Ameristone's claims for conspiracy, conversion, unfair trade practices, breach of fiduciary duty, breach of contract, and breach of contract accompanied by fraudulent acts. Finally, Ameristone maintains that Alpert and Klappholz knew Ameristone was based in South Carolina and that the loss of profits from the Lowe's program would injure Ameristone in South Carolina. Upon review of the record, the Court concludes that Ameristone has met its burden of showing that its claims arise out of Defendants Klappholz and Alpert's contacts with South Carolina.

The final prong of the three-part test requires the Court to determine whether jurisdiction is constitutionally "reasonable." In making this determination, the Court evaluates "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Nolan*, 259 F.3d at 217 (quoting *Burger King*, 471 U.S. at 477). "More generally, [the Fourth Circuit's] reasonableness analysis is designed to ensure that jurisdictional rules are not exploited in such a way as to make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." *Id.* (internal quotation marks omitted).

The Court finds that there is nothing unreasonable about subjecting Defendants Klappholz and Alpert to jurisdiction in South Carolina. "[B]ecause modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." *Burger King*, 471 U.S. at 474 (internal quotations omitted). Although it may be inconvenient for Defendants to

12

litigate this case in South Carolina, the inconvenience is not so grave as to offend constitutional due process principles, especially because these Defendants, as employees and agents of Defendant Ceramic, likely will be called upon to testify in this forum on behalf of Ceramic. Moreover, Plaintiffs have an interest in litigating the dispute in South Carolina, and South Carolina undoubtedly has an interest in deterring the type of conduct alleged here. In sum, given Defendants' contacts with the forum state, the court finds that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (internal quotations omitted). Accordingly, the Court concludes that it has personal jurisdiction over both Defendant Alpert and Defendant Klappholz and denies their motion to dismiss pursuant to Rule 12(b)(2).

### 2. Floors Defendants

In a supplemental affidavit, Campbell sets forth the following facts to establish that Defendants Jones and Floors 2000 purposely availed themselves of the privileges of conducting activities in South Carolina. At Alpert's request, Ameristone sent a *Daino* tile sample to Jones of Floors 2000 in Florida in August 2011. In September 2011, Alpert informed Campbell that Jones of Floors 2000 would make the presentation to Lowe's and had requested specific Ameristone samples, including the *Daino*, for the presentation. In preparation for the Lowe's presentation, Campbell had several phone conversations from his office in South Carolina with Jones and Alpert. Through Ceramic, Campbell gave Floors 2000 and Jones authority to sell Ameristone products to Lowe's at specific price points. In the Atlanta office of Ege Ceramics, Campbell saw Ameristone tile samples signed by Jones and learned that Jones had traveled with Alpert to Turkey to approve production of the copied *Daino* and *Breccia* samples. Finally, Ameristone points to Floors 2000's contacts unrelated to the Lowe's stocking program, including

13

that Floors 2000 had a resident salesperson in South Carolina until September 2011 and that Floors 2000 purchased a significant amount of Ameristone products in the years and months preceding the filing of this action.  Ameristone sent Floors 2000 invoices totaling $390,087.69 between December 2010 and February 2013, and Floors 2000 paid that amount by check mailed to Ameristone's headquarters in South Carolina.

Ameristone has not met its burden of establishing that the Court has personal jurisdiction over the Floors Defendants.  There simply is no evidence that the Floors Defendants reached into South Carolina to initiate a business relationship with Ameristone, made in-person contact with Ameristone in South Carolina, entered into or negotiated a contract with Ameristone, or engaged in extensive communications with Ameristone.   The record suggests that Jones's communications with Campbell were limited to several phone conversations during the lead-up to the Lowe's presentation and to communications about unrelated Ameristone tiles that Floors 2000 carried between 2011 and 2013.  It is unclear if Jones ever initiated any of these calls. Ameristone did not directly authorize the Floors Defendants to represent it in the Lowe's presentation; instead, it gave authorization via Ceramic.  Finally, that Floors 2000 mailed at least one check to South Carolina to pay Ameristone for tiles purchased from Ameristone between December 2010 and February 2013 is insufficient to establish purposeful availment.  *See Helicopteros*, 466 U.S. at 418 (holding that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions").

Moreover, Ameristone has not established that its claims arise out of the Floors Defendants' contacts with South Carolina.  Ameristone's claims against the Floors Defendants include negligent misrepresentation, interference with a contractual relationship, civil

14

conspiracy, conversion of Ameristone's assets and goodwill, and unfair trade practices. These claims seem to arise out of the Floors Defendants' contacts with Florida, Georgia, North Carolina, and Turkey. Upon this record, the Court concludes that Ameristone has not met its burden of showing that Defendants Floors 2000 and Jones purposefully established minimum contacts within the forum or that Ameristone's claims arise out of forum-related activities. *See Nolan*, 259 F.3d at 216. Accordingly, the Court grants the Floors Defendants' motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2).[4]

## II.    Klappholz and Alpert's Motion to Dismiss for Improper Venue under Rule 12(b)(3)

"When a defendant objects to venue under Rule 12(b)(3), [the] plaintiff bears the burden of establishing that venue is proper." *Butler v. Ford Motor Co.*, 724 F. Supp. 2d 575, 586 (D.S.C. 2010). A plaintiff must make "only a prima facie showing of proper venue in order to survive a motion to dismiss" made under Rule 12(b)(3). *Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 366 (4th Cir. 2012). In assessing whether there has been a prima facie venue showing, the court must view the facts in the light most favorable to the plaintiff and may consider evidence outside the pleadings. *Id.* at 365-66. A case filed in an incorrect venue must be dismissed, or, if in the interests of justice, transferred to a district in which it could have been brought. 28 U.S.C. § 1406(a).

In general, a civil action may be brought in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in

---

[4] The Court does not reach the Floors Defendants' alternative arguments that this action should be dismissed due to improper venue or failure to state a claim. Furthermore, the Court denies Ameristone's request for limited discovery into whether the Floors Defendants may be subject to the Court's general personal jurisdiction.

this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

Ameristone argues that venue is proper because a substantial part of the events or omissions giving rise to its claims occurred in South Carolina. Alpert solicited Ameristone directly in South Carolina to enter into a business arrangement with Ceramic, and Ameristone negotiated and signed the Agent Agreement in South Carolina. Ameristone carried out its obligations under the Agent Agreement from South Carolina, except for the occasional visit to its manufacturing partners in Spain. Alpert contacted Ameristone in South Carolina to solicit Ameristone's involvement in the Lowe's program and to give and get updates about the submission process, and Klappholz was included in many of these communications. Although the sample tiles were manufactured in Spain, Ameristone did the majority of the work that went into putting the Lowe's submission together—including coordinating the manufacturing, pricing, and shipping of the samples—from its South Carolina office. Alpert informed Campbell, who was in South Carolina, that Lowe's had not selected any Ameristone tiles. Finally, the tiles that Ameristone alleges were stolen by Klappholz and Alpert and replicated under different names were sold at Lowe's stores in South Carolina.

Klappholz and Alpert, however, argue that venue in South Carolina is improper and emphasize that (1) they live and work in Florida; (2) they planned Ceramic's business and participation in the Lowe's stocking program from Florida; (3) the Territory did not include South Carolina; (4) the tiles at issue were not manufactured in South Carolina; (5) the tiles wound up in South Carolina only incidentally; and (6) Klappholz and Alpert each made only one visit to South Carolina in connection with the Agent Agreement.

16

The Court concludes that Ameristone has made a prima facie showing that venue is proper in South Carolina.  Ameristone's claims against Klappholz and Alpert arise from their roles as Ameristone's agents as well as the parties' participation in the Lowe's program. Ameristone conducted a substantial part of its obligations with regard to that program in South Carolina.  Furthermore, Alpert contacted Ameristone in South Carolina to solicit Ameristone's participation in the program and to receive and provide updates related to the program. Klappholz was a party to many of these communications.  The alleged misrepresentation by Alpert occurred during a phone conversation with Campbell in South Carolina.  From these facts, the Court is satisfied that a substantial part of the events or omissions giving rise to Ameristone's claim occurred in South Carolina.  *See Gateway Gaming, LLC v. Custom Game Design, Inc.*, C.A. No. 8:06-01649-HMH, 2006 WL 2781043, at *5 (D.S.C. Sept. 25, 2006) (finding venue proper based on contract negotiations via telephone and email from the plaintiff in South Carolina to the defendant in Texas and on plaintiff's performance of its obligations in South Carolina); *Figgie Int'l, Inc. v. Destileria Serrales, Inc.*, 925 F. Supp. 411, 412-13 (D.S.C. 1996) (finding venue proper over Puerto Rican defendant where plaintiff's base of operations for the negotiation of the contract and for coordination of the engineering, manufacturing, and shipping of the equipment took place in South Carolina).  Accordingly, the Court denies Defendants Klappholz and Alpert's motion to dismiss pursuant to Rule 12(b)(3).

### III.    Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted is a challenge to the legal sufficiency of a complaint, as governed by Rule 8." *Federal Trade Comm'n v. Innovative Mktg.*, 654 F. Supp. 2d 378, 384 (D. Md. 2009); *see Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss

17

under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.") Under the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Additionally, under Rule 9(b), in alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake."  Finally, "[i]f an item of special damage is claimed, it must be specifically stated."  *Id.* 9(g).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678. Moreover, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  The Supreme Court has explained that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.  Thus, "[i]n ruling on a 12(b)(6) motion, a court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff."  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty, Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (internal quotations omitted).  Furthermore, "a court may consider

18

documents attached to the complaint or the motion to dismiss so long as they are integral to the complaint and authentic." *Id.*

### A. Counts I - III

The Ceramic Defendants contend that Ameristone has failed to state a claim in any of the causes of action pled against them in the Complaint. Having reviewed the pleadings, the parties' memoranda, and the Agent Agreement attached to Defendants' motion,[5] the Court finds that Count I of the Complaint—a claim for breach of contract against Defendant Ceramic— sufficiently alleges the three elements of a breach-of-contract claim, including damages. Accordingly, the Court concludes that Count I states a claim for relief that is plausible on its face. As for Count II, Ameristone concedes that its claim for breach of the covenant of good faith and fair dealing is not a separate cause of action under South Carolina law, but instead is subsumed under the breach of contract claim. *See RoTec Servs., Inc. v. Encompass Servs., Inc.*, 597 S.E.2d 881, 884 (S.C. Ct. App. 2004) (concluding that "the implied covenant of good faith and fair dealing is not an independent cause of action separate from the claim for breach of contract"). Accordingly, the Court grants Defendants' motion to dismiss Count II. With regard to Count III—a claim for breach of contract accompanied by fraudulent acts—the Court agrees with the Ceramic Defendants that this claim should be dismissed as against Klappholz and Alpert because they were not parties to the Agent Agreement, and thus Ameristone cannot show that they breached the contract. However, the Court concludes that Count III is more than sufficient to withstand the heightened pleading requirements of Rule 9(b) as against Defendant Ceramic.

---

[5] As this action arose from the Agent Agreement, the contract is integral to the Complaint and can be considered without converting this motion into one for summary judgment. *See Kensington Volunteer Fire Dep't, Inc.*, 684 F.3d at 467.

19

Accordingly, the Court denies Ceramic's motion as to Counts I and III, dismisses Count II in full, and dismisses Count III as against Klappholz and Alpert.

### B. Count IV

In Count IV, Ameristone alleges that Defendants Ceramic, Klappholz, and Alpert each breached their fiduciary duty to Ameristone.  These Defendants argue that Ameristone's allegations do not justify the imposition of a fiduciary duty on the Ceramic Defendants because the contractual relationship created by the Agent Agreement did not create a special relationship similar to those that have been held to create a fiduciary duty under South Carolina law.  "A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150, 152 (S.C. Ct. App. 1987).  The question of whether a fiduciary duty exists is a question of law for the court. *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 715 (S.C. 2003).  "Historically, [South Carolina courts have] reserved imposition of fiduciary duties to legal or business settings, often in which one person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters." *Id.* at 716.  "The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party." *Burwell v. S.C. Nat'l Bank*, 340 S.E.2d 786, 790 (S.C. 1986).

In the Complaint, Ameristone alleges that under the Agent Agreement, Ceramic was Ameristone's sole exclusive sales agent in the Territory, Ameristone could not appoint any other agent to sell its products in the Territory, and Ameristone itself could not sell its products directly or indirectly within the Territory.  Thus, Ameristone alleges that it relied exclusively on

Ceramic to act as its sales agent. Ameristone further alleges that Ceramic and its salespersons acted as Ameristone's exclusive agents in the Lowe's program. Moreover, under the Agent Agreement, Ameristone was to share confidential information with Ceramic and its agents, and Ceramic was to keep such information and design specifications confidential. The Court concludes that based on the allegations in the Complaint, Ameristone has pled facts sufficient to state a claim that a fiduciary relationship existed and that it was breached. Accordingly, the Court denies the Ceramic Defendants' motion to dismiss Count IV.

### C.  Count V

Next, the Ceramic Defendants argue that Ameristone failed to state a claim in Count V for negligent misrepresentation. Defendants specifically argue that Ameristone did not sufficiently plead the final element of the claim for negligent misrepresentation—i.e., that plaintiff suffered a pecuniary loss as a proximate result of its reliance on defendant's representation. However, the Court concludes that Count V is more than sufficient to withstand the heightened pleading requirements of Rule 9(b). *See Pitten v. Jacobs*, 903 F. Supp. 937, 951 (D.S.C. 1995) (noting that claims for negligent misrepresentation are subject to the heightened pleading requirements of Rule 9(b)). Accordingly, the Court denies the Ceramic Defendants' motion to dismiss Count V.

### D.  Count VII[6]

The Ceramic Defendants next contend that the Court should dismiss Count VII's civil conspiracy claim. In order to state a claim for civil conspiracy, Ameristone was required to plead that two or more persons joined together for the purpose of injuring Ameristone, causing special damage to Ameristone. *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d

---

[6] Count VI is a claim against only the Floors Defendants. Because the Court has granted the Floors Defendants' motion to dismiss for lack of personal jurisdiction, the Court does not address Count VI.

574, 579 (S.C. 2009). To sufficiently plead special damages, Ameristone had to allege "that the acts in furtherance of the conspiracy were separate and independent from other acts alleged in the complaint" and resulted in damages beyond those alleged in other causes of action. *AJG Holdings LLC v. Dunn*, 708 S.E.2d 218, 222-23 (S.C. Ct. App. 2011); *see Springer v. Pelissier*, No. 6:10-cv-01303-JMC, 2011 WL 2601895, at *2 (D.S.C. July 1, 2011) ("The plaintiff must also plead damages suffered as a result of the conspiracy that go beyond damages alleged in other causes of action.").

Upon review of the Complaint and the parties' arguments, the Court concludes that Ameristone failed to plead in Count VII any special damages beyond those alleged in other counts of the Complaint. In the civil conspiracy count, Ameristone alleges that as "a direct and proximate result of Defendants' conspiracy to steal, replicate, manufacture, and sell Ameristone's products, Plaintiff has incurred special damages." Complaint ¶ 69, dkt. 1. However, Ameristone also alleges that it incurred "special damages" in Count IV's breach of fiduciary duty claim, Count V's negligent misrepresentation claim, and Count IX's unfair trade practices claim. Because Ameristone failed to articulate any special damages beyond those alleged in other counts of the Complaint, the Court dismisses Count VII.

### E. Count VIII

Next, the Ceramic Defendants challenge the sufficiency of Count VIII, which alleges a cause of action for conversion of Ameristone's assets and goodwill. South Carolina courts define conversion as "the unauthorized assumption in the exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights." *Moseley v. Oswald*, 656 S.E.2d 380, 382 (S.C. 2008). Conversion is a wrongful act that may arise by the illegal use or misuse, or by a wrongful taking or detention, of another's personal property.

22

*Hawkins v. City of Greenville*, 594 S.E.2d 557, 566 (S.C. Ct. App. 2004). "To establish the tort of conversion, the plaintiff must establish either title to or right to the possession of the personal property." *Moseley*, 656 S.E.2d at 382. Intangible rights are normally not the proper subject for a conversion claim. *Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P*, 684 S.E.2d 756, 763 (S.C. 2009). The South Carolina Supreme Court recently held that, to the extent that certain intangible rights may properly be the object of a suit for conversion, the tort of conversion "should be limited to intangible property rights that are identified with some document," such as a stock certificate, promissory note, or bond. *Id.*; *see* 18 Am. Jur. 2d Conversion § 7 (2004).

Upon review of the Complaint and the pleadings, the Court concludes that Ameristone has sufficiently pled a cause of action for conversion of its assets. Ameristone specifically pled that the *Daino* and *Breccia* tile samples were its business assets and property, thus pleading that it had title over the property. Furthermore, Ameristone alleges that Defendants, without Ameristone's knowledge or permission, delivered the tile samples to Ege so that Ege could replicate the tiles, thus wrongfully exercising the right of ownership over the tiles to the exclusion of Ameristone's rights. However, the Court agrees with Defendants that Ameristone has not sufficiently pled a cause of action for conversion of goodwill, as there is no allegation that the "goodwill" specified in the Complaint—i.e., the "favorable consideration of current and potential customers associated with Ameristone products"—is identified with a document. Complaint ¶ 72; s*ee Gignilliat*, 684 S.E.2d at 763. Accordingly, the Court denies Defendants' motion to dismiss Count VIII as to the claim for conversion of Ameristone's assets, but grants the motion as to the claim for conversion of Ameristone's goodwill.

23

### F. Count IX

Finally, the Ceramic Defendants contend that the Court should dismiss Count IX, which alleges a violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"). SCUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39–5–20(a). Trade or commerce includes "the advertising, offering for sale, sale or distribution of any services and any property . . . and any other article, commodity or thing of value." *Id.* § 39–5–10(b). To state a SCUTPA claim, the plaintiff must allege "(1) that the defendant engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest." *Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 291 (4th Cir. 1998). "Under South Carolina law, unfair or deceptive acts have an adverse impact upon the [public] if those acts have the potential for repetition." *Bessinger v. Food Lion, Inc.*, 305 F. Supp. 2d 574, 581 (D.S.C. 2003). Potential for repetition can be demonstrated by either "showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence" or "showing the company's procedures created a potential for repetition of the unfair and deceptive acts." *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461, 466 (S.C. 2004). "[T]he plaintiff in a SCUTPA action is required only to allege and prove those facts sufficient to demonstrate potential for repetition; at that point, [the] plaintiff has proven an adverse effect on the public interest sufficient to recover under the SCUTPA." *Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc.*, 176 F. Supp. 2d 510, 516 (D.S.C. 2001). "However, conduct that affects only the parties to the transaction and not the public interest provides no basis for a SCUTPA claim." *Bessinger*, 305 F. Supp. 2d at 581.

In its Complaint, Ameristone alleges that "Defendants' acts have the potential for harmful effects to the public interest because they are capable of repetition." Complaint ¶ 79. However, beyond this conclusory statement, Ameristone provides no specific facts demonstrating that the Defendants have conducted the same kind of actions in the past or that their procedures or business practices created a potential for repetition in the future. Without more, the Court concludes that Ameristone has failed to allege facts to establish an adverse effect on the public interest sufficient to recover under the SCUTPA. *See Ethox Chem., LLC v. Coca-Cola Co.*, No. 6:12–cv–01682–TMC, 2013 WL 41001, at *3 (D.S.C. Jan. 3, 2013) (finding insufficient to establish adverse effects on public interest the allegation that "Coca–Cola has been accused of engaging in unfair methods of competition and deceptive business practices" in the past and that "there is a legitimate threat that Coca–Cola will continue to engage in unfair practices and repeat its deceptive business practices, and, as a result, Coca–Cola's actions adversely affect the public interest"). Accordingly, the Court dismisses Count IX's SCUTPA claim.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that the Floors Defendants' motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction is **GRANTED** without prejudice. It is further **ORDERED** that the Ceramic Defendants' motion to dismiss is **DENIED IN PART** and **GRANTED IN PART**. Specifically, the Court denies the Ceramic Defendants' motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(3). The Court further denies their motion to dismiss Counts I, IV, and V, as well as Count III's claim against Ceramic and Count VIII's claim for conversion of assets. However, the Court dismisses with prejudice Count II in full and Count

III as against Klappholz and Alpert.  The Court dismisses without prejudice Counts VII and IX, as well as Count VIII's claim for conversion of goodwill.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**August 19, 2013**
**Charleston, SC**